In re TJ, DJ, and MJ, Children

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-353-CV

IN THE INTEREST OF T.J., D.J., AND M.J., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellants Juanita, mother of T.J., D.J., and M.J., and Warren, father of D.J. and M.J., appeal the trial court’s order terminating their parental rights to their children.
(footnote: 2)  In six points, Mother complains that the evidence is legally and factually insufficient to support the trial court’s finding that termination was in the children’s best interest or either statutory ground for termination found by the trial court.  In two points, Father complains that the evidence is legally and factually insufficient to support either statutory ground for termination found by the trial court.  We will affirm.  

II.  Factual and Procedural Background

Mother is the mother of the three children who are the subject of this termination proceeding:  T.J., born December 2, 1996; D.J., born October 13, 2002; and M.J., born September 5, 2003.
(footnote: 3)  Father is the father of the youngest two children, D.J. and M.J.  

A.  Events Leading up to Formal Removal

On October 14, 2002, one day after D.J. was born, Child Protective Services (CPS) received its first referral concerning Mother and Father.  It alleged that Mother “appeared half dead and was sitting in [a] chair completely out of it.  There was a large amount of marijuana sitting on the coffee table with baggies and scales.”  It also alleged that Father had been drinking in the house with the children and that the children were dirty.  CPS caseworker Brian Poly investigated the referral.  During Poly’s investigation, Mother admitted that she had frequently used cocaine in the past, including when she was pregnant with D.J., although Mother said she had not used cocaine for the past several months.  Mother, who was breast-feeding D.J. at the time, admitted that she had consumed an alcoholic beverage the previous night.  Father told Poly that he began using marijuana at age seventeen, that he had last used marijuana seven or eight months ago, that he was once a member of a criminal gang, and that he had a criminal history that included convictions for possession of a controlled substance (crack cocaine), two aggravated assaults with deadly weapons, two assaults with bodily injury, and theft.  Poly asked both parents to take a drug test; Father never took one, and Mother tested positive for cocaine on October 31, 2002.    

In another interview in December of 2002, Mother admitted that she had used cocaine several times since her first interview with Poly.  Poly ruled the case “unable to parent . . . for neglectful supervision” but did not remove the children from Mother and Father’s care.  Poly asked Mother and Father to attend drug abuse classes, and CPS contracted with Catholic Charities for it to provide family-based services to the family.  

On March 3, 2003, CPS received its second referral, alleging that Mother and Father were using drugs regularly and that Father had engaged in a physical altercation with another person while holding D.J. in his arms.  CPS investigator Bron Gose was unable to locate Mother, Father, and the three children for ten days after CPS received the referral.  Gose finally located Father, T.J., and D.J. at the home of the children’s maternal grandmother, Patricia, and Father admitted to Gose that he had engaged in an altercation with another person but denied that he was holding D.J. at the time.  

On March 21, 2003, while the children were still living with Patricia, CPS received its third referral, alleging that one of the children had returned from a visit with Mother and Father with a facial bruise.  Gose visited the children that day and saw no signs of abuse.  During Gose’s investigation, Mother took several drug tests, the results were positive for cocaine. Gose ruled out physical abuse but ruled “reason to believe neglectful supervision.”  Because Gose determined that Catholic Charities was providing services to the family and that the children were primarily living with Patricia and their maternal great aunt, he did not take the children into CPS’s care. 

CPS received its fourth referral concerning Mother on September 5, 2003. It alleged physical abuse because M.J. was born that day and had tested positive for cocaine.  During CPS investigator Tracy Clary’s investigation, Mother admitted to Clary that she had used cocaine two or three times in the past month while pregnant with M.J.  On Clary’s request, Mother completed a drug assessment, and the drug counselor recommended inpatient drug treatment for Mother.

On September 9, 2003, Mother entered an inpatient drug treatment program called LIGHT.  Her two youngest children, D.J. and M.J., went with her, and T.J. stayed with Micole Darden, Mother’s cousin.
(footnote: 4)  On December 12, 2003, Mother was kicked out of the LIGHT program after she kissed another mother in the program, and CPS placed all three children with their maternal great-grandmother, Willie Darden.
(footnote: 5)  CPS developed a safety plan that directed Willie to supervise all contact between the children and their parents or Patricia. However, Willie violated the safety plan by allowing Patricia to have unsupervised visits with the children so CPS placed the children with a family friend, Antoinette Turner.
(footnote: 6)  After CPS discovered that Turner also had allowed unsupervised visits with Mother and Patricia, the decision was made to remove the children from Turner’s care, but the children could not be located for several months.  In March of 2004, CPS located the children at Patricia’s house. In the meantime, Mother entered another inpatient drug treatment facility called Pine Street.  She successfully completed a twenty-day stay at Pine Street on January 30, 2004, and several days later, she began Community Addiction Treatment Services (CATS), an outpatient drug treatment program.  However, on March 1st and 4th of that year, Mother tested positive for cocaine, and on March 5th, she was unsuccessfully discharged from CATS.  Additionally, on July 19, 2004, Father was convicted of robbery by threats and sentenced to two years’ imprisonment.  

After CPS located T.J., D.J., and M.J. at Patricia’s house, it asked Patricia to take a drug test so that CPS could again attempt to utilize her as a possible placement option, but Patricia tested positive for cocaine.  Mother admitted that she had recently used cocaine, and CPS took T.J., D.J., and M.J. into its care on April 2, 2004.  Three days later, the Texas Department of Family and Protective Services (TDFPS) petitioned for conservatorship and for termination of Mother’s and Father’s parental rights.  

B.  Events Occurring After Formal Removal

CPS continued its involvement with Mother and contracted with therapist Laura Greuner to provide therapeutic services to Mother.  Mother did not regularly attend the weekly therapy sessions.  When she did attend, she talked about self-mutilation (cutting herself) and suicide, and she discussed her on-going drug use.  She was pregnant at the time, and she minimized the fact that she was using drugs while pregnant because she used drugs while pregnant with her other children, yet “they seem to be doing okay.”  

On December 6, 2004, Mother entered an inpatient drug rehabilitation program at Nexus Recovery Center.
(footnote: 7)  Although Mother did not cooperate fully during the program, did not attend all group sessions, and had some anger problems, she successfully completed the program on March 25, 2004.  Mother’s primary counselor at Nexus recommended that she go to a transitional living center and that she participate in individual counseling and the CATS program. Mother did not go to a transitional living center; a CPS caseworker testified that she spoke with a Nexus employee about enrolling Mother in the program, but Mother claimed that the program would not accept her because she did not have any income.  Mother also did not complete the CATS program, and she only sporadically participated in individual counseling.  However, after leaving Nexus, Mother took two negative drug tests—one on March 25, 2005 and another just one week before trial.  

On August 25, 2005, five days before trial, Mother visited with Greuner and informed her that she had quit using drugs, that she was staying in a night shelter, and that if she were to get her children back, she planned on living at the Salvation Army shelter with them.   

Meanwhile, on May 5, 2005, Father was released from prison for his robbery conviction.  After his release, he visited his children six out of a possible eighteen times before the date of trial. 

On August 30, 2005, after hearing testimony from both sides, the trial court found that Mother’s parental rights to T.J., D.J. and M.J. and Father’s parental rights to M.J. and D.J. should be terminated because Mother and Father had violated sections 161.001(1)(D) and (E) of the Texas Family Code and because termination was in the best interest of the children.  Accordingly, the trial court entered an order terminating Mother’s and Father’s parental rights.  Both parents appeal that order.

III.  Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the State must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001 (Vernon Supp. 2005); 
Richardson
 
v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
see also
 
Tex. Fam. Code Ann.
 § 161.001. The higher burden of proof in termination cases alters the appellate standard for both legal and factual sufficiency reviews.  
In re J.F.C., 
96 S.W.3d 256, 265 (Tex. 2002); 
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).  Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.  
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  

Accordingly, in reviewing the evidence for legal sufficiency in parental termination cases, we “look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.”  
J.F.C.
, 96 S.W.3d at 266.  In conducting our review, we must disregard all evidence that a reasonable trier of fact could have disbelieved; however, we must consider undisputed evidence even if it does not support the finding.  
Id.
  If, after conducting our review, we determine that no reasonable trier of fact could have formed a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient.  
Id
.

In determining a factual sufficiency point, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child’s best interest.  
Tex. Fam. Code Ann.
 § 161.001; 
C.H.
, 89 S.W.3d at 25.  In reviewing the factual sufficiency of the evidence, we must consider all the evidence in the record, both that in support of and contrary to the trial court’s findings.  
C.H.
, 89 S.W.3d at 27-29.  Additionally, we must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding.  
J.F.C.
, 96 S.W.3d at 266.  If the disputed evidence is of such magnitude that a trier of fact could not reasonably have formed a firm belief or conviction that its finding was true, then the evidence is factually insufficient.  
Id
. 

IV.  Endangerment Finding

In Father’s two points and in Mother’s third through sixth points, they complain that the evidence was legally and factually insufficient to support the trial court’s endangerment findings.  

Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  To prove endangerment under subsection (D), TDFPS had to prove that Mother and Father (1) knowingly (2) placed or allowed their children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D).  Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children’s physical well-being was the direct result of Mother’s and Father’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  However, it is not necessary that the parent’s conduct be directed at the children or that the children actually suffer injury.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the children’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children’s birth.  
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children.  
See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A factfinder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent.  
See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, and 
C.H.
, 89 S.W.3d at 17.  Drug use and its effect on a parent’s life and her ability to parent may establish an endangering course of conduct.  
Dupree v. Tex. Dep’t of Protective & Regulatory Servs.
, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child’s well-being.  
J.T.G.
, 121 S.W.3d at 133.  While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment.  
Boyd
, 727 S.W.2d at 533-34; 
R.W.
, 129 S.W.3d at 743-44
.   

The record contains the following evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children.  Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.  
J.T.G.
, 121 S.W.3d at 126. Father admitted to using drugs in the past, beginning at age seventeen, and admitted that he has sold drugs in the past.  He has two prior convictions for possession of cocaine.  During CPS’s investigation into the first referral concerning Mother and Father, Gose asked Father to take several drug tests, but Father never took one.  Father testified that he lacked transportation to go take a drug test and that once, he showed up to take a test but that he did not have proper identification.  However, Gose testified that he had once tried to pick up Father to take him to his scheduled drug test, but no one answered the door. Father testified that he never used drugs around the children but that he often drank around them.  Father testified that he still drinks “like two or three cans of beer” every day and that he does not believe he could care for his children after drinking that amount. 

The record also shows that Father has an extensive criminal history beginning in 1995 and continuing through July 19, 2004.  He has been incarcerated for much of his children’s lives.  Several of Father’s convictions are for violent crimes, and one referral received by CPS alleged that Father had gotten into a physical altercation while holding D.J. in his arms, although Father denied that he was holding D.J. at the time.  
See J.T.G.
, 121 S.W.3d at 125 (noting that “abusive or violent conduct by a parent . . . may produce an environment that endangers the physical or emotional well-being of a child.”) Father testified that he knew Mother was using cocaine but that there was “[n]ot much [he] could do.”  Father testified that he attended several drug classes with Mother in the beginning of CPS’s involvement in this case and that he tried to remove D.J. from Mother’s drug-using environment by taking the baby to visit his relatives for hours at a time.  He testified that he knew “the kids couldn’t be removed from [Mother’s] residence.”  

The record demonstrates that Mother has a history of illegal drug use, including during some of her pregnancies.  Mother admitted to using cocaine throughout CPS’s involvement in this case, and she tested positive for cocaine at least five times.  CPS received a total of four referrals regarding Mother and Father—three of which dealt with Mother’s drug use.  Even after Mother successfully completed a twenty-day stay at the Pine Street inpatient drug treatment facility, she tested positive for cocaine and failed to complete the CATS program a little over a month later.
(footnote: 8)  Additionally, despite Mother’s contention that she had stopped using drugs prior to trial and despite her two recent clean drug tests, the trial court was not required to ignore her history of drug use merely because it allegedly abated before trial.  
See R.W., 
129 S.W.3d at 741.  Therefore, even if the trial court believed that Mother had stopped using drugs prior to trial, the court could have believed that Mother’s drug use would likely recur and further jeopardize her children’s well-being.  
See id.

Two referrals concerning Mother and Father alleged that they were using or selling drugs inside their home.  CPS caseworker Poly testified that during his investigation into the first referral concerning Mother and Father, five-year-old T.J. seemed to know what drugs were.  Poly was confused by T.J.’s answer to Poly’s questions about drugs; T.J. first said that cigarettes were drugs, but then he talked about drugs “being black and having to wrap up.”  T.J. also said his sister was once “holding weed” and that Mother “rolled weed.”  

Additionally, the record demonstrates that Mother was sexually abused by her grandmother’s husband, Johnny, when she was a child.  However, after M.J. was born, Mother allowed the hospital to release M.J. into Willie’s care despite the fact that Willie was still married to Johnny.  Mother also recommended Willie as a voluntary placement for the children during CPS’s involvement in the case. 

We have carefully reviewed the entire record.  Looking at the evidence in the light most favorable to the trial court’s findings, giving due consideration to evidence that the trial court, as factfinder, could reasonably have found to be clear and convincing, we hold that the court reasonably could have formed a firm belief or conviction that Mother knowingly placed T.J., D.J., and M.J. in conditions and engaged in conduct that endangered the children’s physical or emotional well-being.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E); 
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  Additionally, giving due consideration to evidence that the trial court could reasonably have found to be clear and convincing, we hold that the trial court reasonably could have formed a firm belief or conviction that Father knowingly placed D.J. and M.J. in conditions and engaged in conduct that endangered the children’s physical or emotional well-being.
(footnote: 9)  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D), (E); 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.   Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s findings on endangerment.  We overrule Father’s two points and Mother’s third through sixth points.

V.  Best Interest Finding

In her first two points, Mother argues that there was insufficient evidence to support the trial court’s finding that termination of her parental rights was in her children’s best interest.  TDFPS argues that there was ample evidence to support the trial court’s finding.

A strong presumption exists that the best interest of a child is served by keeping custody in the natural parent.  
In re W.E.C.
, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.).  The factfinder may consider a number of factors in determining the best interest of the child, including the following:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H.
, 89 S.W.3d at 27.

Regarding the first factor, the children did not testify at trial, but Micole, with whom T.J. had been living since October of 2004, testified that T.J. was adjusting very well.  She testified that T.J. was “pretty anxious” about reuniting with Mother and that if Micole were able to adopt him, he would have much more stability.  Tonyia Brown, the CPS caseworker assigned to the case after the show-cause hearing, testified that T.J. was “more secure in the fact that he’s [with Micole] and he’s asked not to move him.”  As for D.J. and M.J., both had bonded with their foster mother, Daphne Whitaker, and her six-year-old son. 

Regarding the second factor—the children’s present and future physical and emotional needs—Brown testified that T.J. was doing well with Micole and that he was receiving therapy at his school.  Micole testified that T.J. was doing very well in school and that he got into trouble like most eight-year-old children do.  Brown testified that M.J. and D.J. were also doing great and that they did not have any special medical needs.  D.J. was once “a little behind” developmentally, but at the time of trial, both girls were developmentally on track.  Whitaker testified that D.J. “has a lot of anger issues” but that D.J. had been receiving therapy.  Whitaker testified that M.J. also had tantrums but that they were not as bad as D.J.’s.  

Regarding the third factor—the present and future physical and emotional dangers to the children—throughout CPS’s investigations, caseworkers expressed no concerns about the condition of Mother’s apartment or the amount of food in the home.  However, Brown testified that Mother was not stable enough to care for her children.  At the time of trial, Mother was living in a night shelter, and she was working for the first time in at least a year, although only on Saturdays at the night shelter.  Mother has a history of illegal drug use, and the record also demonstrates that Mother is bipolar, has a history of depression, and was not taking her medications properly.  Mother talked with her therapist about suicide and about harming herself.  Mother’s therapist testified that she was concerned with Mother’s “ability to judge who might be a risk [to her children].”   

Regarding Mother’s parenting abilities—the fourth 
Holley
 factor—Mother admitted to using cocaine while pregnant with several of her children, and M.J. tested positive for cocaine when she was born.  Mother left her children in the care of a man who had sexually abused Mother when she was young.  Mother’s therapist testified that Mother viewed T.J., D.J., and M.J. more like her friends instead of her children, that she referred to T.J. as “her homey,” and that she would allow him to watch R-rated movies.  Both Mother’s therapist and Brown expressed concerns about Mother’s stability, especially because she was living at a night shelter.  Brown testified that although Mother had been drug-free for several months, she had not changed her living environment. Mother completed one parenting class that Brown recommended for her but failed to complete the next parenting class that Brown recommended.  Mother testified that she learned how to interact with her children in the parenting class. 

Concerning the fifth factor, Mother had utilized a variety of the programs offered by CPS, although often unsuccessfully.  These programs included inpatient drug treatment, outpatient drug treatment, some parenting classes, some individual counseling, therapy, and Narcotics Anonymous classes.   Regarding CPS’s plans for the children—the sixth and seventh factors—Brown testified that CPS’s long-term plan was for T.J. to remain with Micole and for D.J. and M.J. to remain with Whitaker.  Micole planned to adopt T.J., and Whitaker expressed an interest in adopting D.J. and M.J. after she learned more about D.J.’s anger issues.  Micole testified that she has been caring for T.J. for most of his life.  She testified that T.J. saw his sisters once or twice a week, and Whitaker testified that it was important for the girls to continue these visits. 

Mother planned to take her children to a homeless shelter if they were returned to her.  At trial, Mother admitted that a homeless shelter is not an appropriate setting for her children, but she stated, “[I]f I get my kids back everything is going to fall into place.”  During Mother’s stay at Nexus, she reported that she had no income over the previous twelve months and that she supported herself through family, friends, and “illegal gain.”  At the time of trial, Mother was taking classes to get her GED, although she had not yet finished.  She worked at the night shelter on Saturdays and volunteered at the shelter during the week. 

The record as outlined above provides evidence of Mother’s acts or omissions indicating that the existing parent-child relationship was not in her three children’s best interests—the eighth 
Holley 
factor.  Mother has a long history of illegal drug use, and although there is evidence that she had been drug-free since she left Nexus, the record demonstrates that Mother failed to follow through with Nexus’s recommended treatment after she left the facility. Mother’s therapist testified that Mother did not take responsibility for the reason her children were removed from her care.  Instead, Mother told her therapist that “she wasn’t too sad because if she loses these [three children] she can just have some more.” 

Finally, concerning the ninth factor—any excuse for the parent’s acts or omissions—Mother testified that the LIGHT, Pine Street, and CATS programs did not help her.  However, she testified that the Nexus program “seemed to help” her and that she had been drug-free since she left there.  Mother testified that she had not been able to find employment or a home of her own because no one would talk to her when she was having a mood swing or was depressed. 

Looking at all of the evidence in the light most favorable to the best-interest finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  
See J.F.C.
, 96 S.W.3d at 266; 
J.T.G.
, 121 S.W.3d at 124-25.  Additionally, giving due consideration to evidence that the factfinder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother’s parental rights would be in the best interest of T.J., D.J., and M.J.  
See W.E.C.
, 110 S.W.3d at 247.  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s best-interest finding.  We overrule Mother’s first and second points.

VI.  Conclusion

Having overruled Mother’s six points and Father’s two points, we affirm the trial court’s judgment.

PER CURIAM

PANEL F: WALKER, J.; CAYCE, C.J.; and MCCOY, J.

DELIVERED: March 30, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.

2:
The trial court also terminated the parental rights of T.J.’s alleged father, but he is not a party to this appeal.  

3:
Mother also has one other child who is not a party to this proceeding.  

4:
Clary did not consider Father as a possible placement option because Patricia told Clary that Father was in jail at the time.  

5:
Although CPS was satisfied with the care Micole provided for T.J., it decided to remove T.J. from Micole’s care because Patricia harassed Micole, causing the placement to break down.  CPS did not place the children with Patricia because it discovered that Patricia had a history of drug abuse. 

6:
CPS did not take the children into custody at that point because Mother was cooperating with CPS and using its services.  

7:
Mother was seven months pregnant when she entered Nexus.  

8:
Mother also received a certificate of completion from a second stay at Pine Street, but she completed only fourteen days of a twenty-eight day program. 

9:
TDFPS argues that Father failed to preserve error regarding his legal sufficiency complaint because his statement of points that he presented to the trial court included only his factual sufficiency complaint.  
See 
Tex. Fam. Code Ann. 
§ 263.405(i) (Vernon Supp. 2005) (providing that “[t]he appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal”). 
 However, because we hold that the evidence is factually sufficient to support the trial court’s endangerment findings, the evidence is necessarily legally sufficient to support the findings.  
See British Am. Ins. Co. v. Howarton, 
877 S.W.2d 347, 352 (Tex. App.—Houston [1st Dist.] 1994, writ dism’d by agr.).  Thus, we do not address TDFPS’s contention.